ALAN E. SILVER *v.* STATEWIDE
GRIEVANCE COMMITTEE
(SC 15560)

Borden, Berdon, Katz, Palmer and McDonald, Js.

Argued May 28—officially released July 29, 1997

*Maureen A. Horgan*, assistant bar counsel, for the appellant (defendant).

*William F. Gallagher*, with whom, on the brief, was *Barbara L. Cox*, for the appellee (plaintiff).

*Ralph G. Elliot, Wesley W. Horton, James A. Trowbridge* and *Earl F. Dewey II* filed a brief for the Connecticut Bar Association, Committee of Professional Ethics, as amicus curiae.

*Opinion*

PER CURIAM. This certified appeal concerns the relationship between General Statutes (Rev. to 1993) § 38a-369 (b),[1] and rules 1.15 (b) and 1.6 (a) of the Rules of Professional Conduct[2] governing the ethical

---

[1] General Statutes (Rev. to 1993) § 38a-369 (b) provides: "Whenever a person who receives basic reparations benefits for an injury recovers damages, either by judgment or settlement, from the owner, registrant, operator or occupant of a private passenger motor vehicle with respect to which security has been provided under sections 38a-19 and 38a-363 to 38a-388, inclusive, or from a person or organization legally responsible for his acts or omissions, the insurer is entitled to reimbursement from the claimant to the extent that said basic reparations benefits have been paid, minus an amount which represents the insurer's contribution toward attorney's fees for the collection of basic reparations benefits. Such amount shall be computed by multiplying the total amount of such reasonable attorney's fees and costs, by a fraction, the numerator of which shall be the amount of basic reparations benefits received by the claimant and the denominator shall be the amount of damages recovered by the claimant, less court costs. In no event shall such amount exceed one-third the amount of the basic reparations benefits to be reimbursed to the insurer. The insurer shall have a lien on the claimant's recovery for the amount to which he is entitled for such reimbursement; provided no such lien shall attach until such time as the proceeds of such recovery are in the possession and control of such claimant."

[2] Rule 1.15 (b) of the Rules of Professional Conduct provides: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any

obligations of attorneys. The defendant statewide grievance committee appealed upon our grant of certification from the judgment of the Appellate Court, which had concluded that the plaintiff attorney had no ethical duty under rules 1.15 (b) and 1.6 to notify his clients' no-fault insurance carriers of certain personal injury settlement proceeds received by the plaintiff on behalf of two of his clients. *Silver* v. *Statewide Grievance Committee*, 42 Conn. App. 229, 238, 679 A.2d 392 (1996).[3] The Appellate Court had reasoned that, pursuant to General Statutes (Rev. to 1993) § 38a-369 (b), which

funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

Rule 1.6 of the Rules of Professional Conduct provides: "Confidentiality of Information

"(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (a), (b), (c), and (d).

"(b) A lawyer shall reveal such information to the extent the lawyer reasonably believes necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm.

"(c) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary to:

"(1) Prevent the client from committing a criminal act that the lawyer believes is likely to result in substantial injury to the financial interest or property of another;

"(2) Rectify the consequence of a client's criminal or fraudulent act in the commission of which the lawyer's services had been used.

"(d) A lawyer may reveal such information to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client."

[3] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude, under the circumstances of this case, that the plaintiff had no ethical duty under rules 1.15 (b) and 1.6 of the Rules of Professional Conduct, to notify his client's no-fault carrier of the settlement proceeds?" *Silver* v. *Statewide Grievance Committee*, 239 Conn. 948, 686 A.2d 125 (1996).

was in effect at the time of the plaintiff's conduct: (1) the no-fault insurers' lien did not attach to the settlement proceeds until the proceeds had been disbursed by the plaintiff to his clients; (2) until that disbursement, the clients' no-fault insurers did not have an "interest" in the proceeds within the meaning of rule 1.15 (b); and (3) the notification to the no-fault insurers urged by the defendant under rule 1.15 (b) was not "impliedly authorized" within the meaning of rule 1.6 (a). Id., 237–38.

Effective January 1, 1994, however, General Statutes (Rev. to 1993) § 38a-369 was repealed by Public Acts 1993, No. 93-297, as was our entire no-fault insurance statutory scheme. Thus, as the plaintiff aptly stated at oral argument, this case "is one of first and last impression." Although the plaintiff's conduct predated that legislative repeal, "we conclude that the significance of this appeal has been undermined significantly by this legislation and, therefore, that the appeal should be dismissed because certification to appeal was improvidently granted." *Lumber Mutual Ins. Co.* v. *Holmes*, 239 Conn. 798, 802, 687 A.2d 162 (1997).

The appeal is dismissed.

BERDON, J., with whom MCDONALD, J., joins, concurring. I write separately in this important case because the issue goes to the heart of the attorney-client relationship, and the unusual decision by the defendant, the statewide grievance committee, would turn attorneys into collection agents for creditors of their clients. The majority, however, merely issues a per curiam decision dismissing the appeal on the ground that certification was improvidently granted because the specific statute involved in this case, General Statutes (Rev. to 1993) § 38a-369 (b), was repealed along with the entire statutory scheme pertaining to no-fault insurance. Allowing the Appellate Court's decision to stand vindi-

cates Alan E. Silver, the plaintiff attorney in these two cases, with respect to the statute that existed at the time of the conduct, but the underlying basis for the defendant's decision to reprimand the plaintiff for misconduct has broader implications and, therefore, requires our full review. It is difficult enough to practice law, without there being uncertainty with respect to an attorney's obligations when claims are made by third parties, the compliance with which would interfere with the attorney's duty of loyalty to his or her client. The bar is entitled to know the requirements of our Rules of Professional Conduct (rules) in advance so lawyers like the plaintiff, in fulfilling their duty of loyalty to their clients, will not be dragged through courts by an aggressive statewide grievance committee.

Furthermore, the plethora of litigation over the one issue in this case, in which the plaintiff has prevailed at every level of review, entitles not only the plaintiff, but the bar, to a clarification of our rules. In this case, the local grievance panel found no probable cause and, after the defendant reversed the local grievance panel and referred the matter to its reviewing committee, only two of the three panel members of the reviewing committee found grounds for a grievance in each case.[1] Subsequently, the plaintiff appealed to the Superior Court, which reversed the defendant's decisions, and

[1] There is no dispute in this case with respect to the standard of review and the burden of proof. "[I]n reviewing a decision of the statewide grievance committee to issue a reprimand, neither the trial court nor this court takes on the function of a fact finder. Rather, our role is limited to reviewing the record to determine if the facts as found are supported by the evidence contained within the record and whether the conclusions that follow are legally and logically correct. . . . Additionally, in a grievance proceeding, the standard of proof applicable in determining whether an attorney has violated the [Rules] of Professional [Conduct] is clear and convincing evidence. . . . The burden is on the statewide grievance committee to establish the occurrence of an ethics violation by clear and convincing proof." (Citations omitted; internal quotation marks omitted.) *Lewis* v. *Statewide Grievance Committee*, 235 Conn. 693, 698, 669 A.2d 1202 (1996).

the defendant appealed to the Appellate Court, which affirmed the Superior Court's decision. *Silver* v. *Statewide Grievance Committee*, 42 Conn. App. 229, 238, 679 A.2d 392 (1996). The defendant then sought and received certification to appeal to this court. *Silver* v. *Statewide Grievance Committee*, 239 Conn. 948, 686 A.2d 125 (1996). We should now put this five year odyssey to rest by affirming the local grievance panel's decision that there was no probable cause that the plaintiff's actions constituted attorney misconduct.

The facts recited by the Appellate Court are not in dispute in the two cases in which the defendant brought grievance proceedings against the plaintiff. "In the first case, the plaintiff represented Samuel Jones on a personal injury claim arising out of a motor vehicle accident. Safeco Insurance Company (Safeco) provided Jones with $5000 in basic reparations benefits in relation to the accident. Safeco advised the plaintiff that it expected to be reimbursed for the benefits from the proceeds of any recovery made by Jones. The plaintiff later settled Jones' claims and received $85,000 in settlement proceeds on behalf of Jones.

"The plaintiff advised Jones that Jones had a legal responsibility to reimburse Safeco, but Jones insisted that the plaintiff distribute to him the full amount of the settlement proceeds. The plaintiff then distributed the full amount of the settlement proceeds to Jones without notifying Safeco of the settlement. Safeco learned of the settlement approximately two years after the plaintiff had disbursed the proceeds to Jones. Safeco then demanded reimbursement of the benefits. When the plaintiff asserted that he had no liability for the reimbursement, Safeco complained in writing to the defendant.

"On March 2, 1992, the local grievance panel for the New Haven judicial district (local panel) found that

there was insufficient evidence to support a finding of probable cause that the plaintiff was guilty of misconduct and forwarded the file to the defendant with the recommendation that the complaint be dismissed. On June 18, 1992, the defendant reversed the local panel and referred the matter to a reviewing committee. On December 27, 1993, the reviewing committee issued a proposed decision recommending that the plaintiff be reprimanded for violating rule 1.15 (b) of the Rules of Professional Conduct. On January 20, 1994, the defendant adopted the proposed decision of the reviewing committee and reprimanded the plaintiff.

"In the second case, the plaintiff represented Marcy La Banca on a personal injury claim arising out of a motor vehicle accident. United Services Automobile Association Casualty Insurance Company (USAA) provided La Banca with $5000 in basic reparations benefits in relation to the accident. USAA notified the plaintiff that it was entitled to reimbursement of the benefits if La Banca's case was settled. The plaintiff settled La Banca's claim arising from the accident for $15,000. The plaintiff distributed the full amount of the settlement proceeds to La Banca without notifying USAA. After USAA learned of the settlement, it demanded reimbursement. The plaintiff asserted that he was not liable for such a reimbursement. On January 28, 1993, USAA informed the defendant of the situation.

"On May 4, 1993, the local panel again found that there was insufficient evidence to support a finding of probable cause and recommended that the complaint be dismissed. On August 19, 1993, however, the defendant reversed the local panel and referred the matter to a reviewing committee. On July 6, 1994, the reviewing committee incorporated by reference its proposed decision in the [case involving Jones] and again recommended that the plaintiff be reprimanded. On August 18, 1994, the defendant adopted the proposed decision

of the reviewing committee and reprimanded the plaintiff.

"The plaintiff appealed both of the defendant's decisions to the trial court, which 'held that Safeco [and USAA] did not have "interest[s]" under rule 1.15 (b) which entitled [them] to notice from [the plaintiff] of his receipt of the settlement proceeds' and 'that Safeco [and USAA were] not "entitled to receive" reimbursement of its no-fault payments from the settlement proceeds in [the plaintiff's] hands. Ergo, [the plaintiff] was not obligated, under the rule, to pay any portion of the settlement proceeds to Safeco [and USAA].' " *Silver* v. *Statewide Grievance Committee,* supra, 42 Conn. App. 231–33.

Like the Superior Court and the Appellate Court in this case, I conclude that the plaintiff neither had a duty to notify Safeco or USAA of the receipt of the settlement proceeds nor a duty to withhold and safeguard an amount equal to the no-fault benefits. Although the issue we certified was whether the Appellate Court properly concluded that the plaintiff did not owe an ethical duty under rules 1.15 (b) and 1.6 of the Rules of Professional Conduct to notify Safeco and USAA of the receipt of settlement proceeds on behalf of two of his clients, I will first discuss whether Safeco and USAA had liens on the settlement proceeds that came into the hands of the plaintiff because the issues are obviously intertwined.

I

I first note that the defendant concedes, by the focus of its argument, that Safeco and USAA did not have statutory or common-law liens[2] on the settlement proceeds while they were in the hands of the plaintiff. In

---

[2] A common-law lien is usually a possessory lien. 51 Am. Jur. 2d 157, Liens § 20 (1970).

arguing that Safeco and USAA had equitable liens on the settlement proceeds belonging to the plaintiff's clients, once they were placed into the hands of the plaintiff as the attorney for the insureds, the defendant relies upon rule 1.15 (b). The rule provides that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." Rules of Professional Conduct 1.15 (b). This rule creates a duty on the part of lawyers to a third party if the third party has an "interest" in the funds or other property of the client that comes into his or her hands. This requires that the word "interest" be defined.

I start with the recognition that "nothing in the Rules should be deemed to augment any substantive legal duty of lawyers . . . ." Rules of Professional Conduct, Scope, p. 5; see also *Mozzochi* v. *Beck*, 204 Conn. 490, 501 n.8, 529 A.2d 171 (1987). In other words, with respect to this case, the rules themselves cannot create a lien not recognized in law. This is underscored by the comments accompanying rule 1.15, where it is indicated that "[t]hird parties, such as a client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a *duty under applicable law* to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party." (Emphasis added.) Rules of Professional Con-

duct 1.15 (b), comment, p. 30.1. In this case there was no duty under the applicable law.

An interest as used in the rules means more than an unsecured claim with respect to a third party. An interest in the fund or property requires that the third party have a matured legal or equitable lien. See 1 G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct (2d Ed. 1996) § 1.15:302, p. 460 ("[t]he Comment to [r]ule 1.15 uses the phrases 'just claims' and 'duty under applicable law' to suggest that the third party must have a *matured* legal or equitable claim in order to qualify for special protection [under the rule]" [emphasis added]); see also Alaska Bar Association Ethics Committee, Opinion No. 3 (1992) ("[i]n order to trigger an obligation on the part of the attorney to pay a creditor's claim, in contravention of a client's instructions, the creditor's claims must be a valid assignment on its face or statutory lien which has been brought to the attorney's attention"); Colorado Bar Association Ethics Committee, Formal Opinion Nos. 94 and 95 (1994) ("[w]here the third party does not hold an interest as a result of a statutory lien or a contract or a court order, the property should be promptly distributed to the client"); Connecticut Bar Association Committee on Professional Ethics, Informal Opinion No. 20 (1995) ("[t]he mere assertion of a third party claim to property is insufficient to create a duty to deliver property to that third party").

Indeed, the attorney's ethical duty is made abundantly clear in an illustrative case presented by Professors Hazard and Hodes in their treatise on the Model Rules of Professional Conduct. The following hypothetical, pertaining to the handling of funds when a client and a third party have competing claims, parallels the facts in the present case. "Lawyer L has been representing Client C in two matters simultaneously: As plaintiff in a tort action and in negotiations with a creditor who

claims that the client owes him $5,000 on a supply contract.

"Settlement is reached in the tort action, and L deposits the settlement draft for $125,000 in his trust account. C jubilantly demands his share of the proceeds (over $90,000) and states that he intends to move to another jurisdiction. He admits that he owes his creditor the disputed $5,000, but says he will not pay unless the creditor follows him to his new domicile and sues." 1 G. Hazard & W. Hodes, supra, § 1.15:303, p. 460.

Hazard and Hodes conclude in their hypothetical case: "L must disburse C's entire settlement share immediately without withholding the $5,000 which he knows the creditor 'is entitled to receive.' Furthermore, *L may not reveal to the creditor either the fact of settlement* or C's plan to abscond.

"While the creditor may be morally 'entitled to receive' the money, C's position is legally sound: 'Absconding' under these circumstances is neither a crime or a fraud. If the creditor fears such an occurrence, it is up to him to take legal action to prevent it, such as by garnishing L's account. A court may or may not grant such relief, but certainly L cannot *sua sponte* perform such a service against the interests of his own client." (Emphasis added.) Id., p. 461.

If there was, for example, a valid assignment by the client of an interest in the settlement proceeds, then that, of course, would be binding on the lawyer and it would be unethical for the lawyer to ignore it once it has been brought to his or her attention. See, e.g., *Bonanza Motors, Inc.* v. *Webb*, 104 Idaho 234, 657 P.2d 1102 (1983); *Berkowitz* v. *Haigood*, 256 N.J. Super. 342, 606 A.2d 1157 (1992); *Leon* v. *Martinez*, 84 N.Y.2d 83, 638 N.E.2d 511, 614 N.Y.S.2d 972 (1994). But that is not the situation in this case.

On appeal, the defendant claims for the first time that Safeco and USAA had "equitable liens" in the settlement proceeds. This, however, defies the clear intent of the legislature who has, by the adoption of § 38a-369 (b), established the public policy of our state with respect to when a lien attaches. See *Local 1303 & Local 1378* v. *Freedom of Information Commission,* 191 Conn. 173, 179, 463 A.2d 613 (1983) ("[p]rimarily, it is for the legislature, which is the arbiter of public policy, to determine what [public policy] shall be" [internal quotation marks omitted]).

In this case the liens *did not attach,* or mature, until the settlement proceeds were placed into the hands of the clients. General Statutes (Rev. to 1993) § 38a-369 (b), pertaining to no-fault insurance benefits, provides in pertinent part: "Whenever a person who receives basic reparations benefits for an injury recovers damages, either by judgment or settlement, from the owner, registrant, operator or occupant of a private passenger motor vehicle with respect to which security has been provided under sections 38a-19 and 38a-363 to 38a-388, inclusive, or from a person or organization legally responsible for his acts or omissions, the insurer is entitled to reimbursement from the claimant to the extent that said basic reparations benefits have been paid, minus an amount which represents the insurer's contribution toward attorney's fees for the collection of basic reparations benefits. . . . The insurer shall have a lien on the claimant's recovery for the amount to which he is entitled for such reimbursement; *provided no such lien shall attach until such time as the proceeds of such recovery are in the possession and control of such claimant.*" (Emphasis added.)

Indeed, to impose liens while the settlement proceeds were in the hands of the plaintiff would be contrary to the clear intent of the legislature. Prior to its amendment in 1981, § 38a-369 (b), then § 38-325 (b), the statute

merely provided that the no-fault insurer "shall have a lien on the claimant's recovery . . . ." General Statutes (Rev. to 1981) § 38-325 (b). In 1981, the Appellate Session of the Superior Court held that "[d]espite the language entitling the insurer to reimbursement from the claimant, the statute clearly states that a lien is to be imposed on the claimant's recovery. Nowhere is it specified that the recovery must be in the possession of the claimant. . . . . [W]e hold that the lien created by § 38-325 (b), was imposed on the proceeds of the claimant's recovery while it was in the possession and control of her attorney." (Citations omitted; internal quotation marks omitted.) *Unigard Ins. Co.* v. *Tremont,* 37 Conn. Sup. 596, 598–99, 430 A.2d 30 (1981).

Shortly after the *Tremont* decision was announced by the court, the General Assembly adopted Public Acts 1981, No. 81-386, § 2, which amended § 38-325 (b) by adding the following language to the already existing lien provision of the statute at the end of subsection (b): "provided no such lien shall attach until such time as the proceeds of such recovery are in the possession and control of such claimant." The plain language of the amendment clearly reversed the law promulgated in *Tremont* that the lien attached while in the hands of the attorney. Furthermore, the legislative history clearly indicates that the General Assembly amended the statute in answer to the *Tremont* decision. Representative Richard Tulisano commented as follows: "This [bill] addresses a court decision which somehow indicated that once it was paid over to anybody to pay for the claimant, the lien already attached and there might in fact be liability on a person who would be only a funnel and an intermediary and this is designed to correct any possible problems in that area." 24 H.R. Proc., Pt. 24, 1981 Sess., p. 7862. Indeed, in *Shelby Mutual Ins. Co.* v. *Della Ghelfa,* 200 Conn. 630, 640, 513 A.2d 52 (1986), this court noted that "[t]here is legislative history to

the effect that the legislature, in amending the statute, was reacting to the Superior Court decision [in *Tremont*], which held that under the pre-1981 version, an insurer may enforce the statutory lien against the insured's attorney." This court concluded, however, that the amendment showed an "intent to modify rather than clarify the original version of the statute," and, therefore, the court held that the amendment did not apply retroactively so as to apply to the settlement proceeds in the possession of the insured's attorney before the 1981 amendment to the statute. Id., 641. In *Shelby Mutual Ins. Co.*, after concluding that the amendment was not retroactive, the court held that the statutory lien was enforceable against the insured's attorney. Id., 641. *Shelby Mutual Ins. Co.*, however, acknowledges that the law has substantially changed *since 1981* because of the amendment to the statute.

The defendant's argument in this case that Safeco and USAA had equitable liens on the settlement proceeds does not alter the outcome. First, the defendant cites to no authority under Connecticut law to support an equitable lien other than the rules, which cannot be the basis for substantive law. Second, an equitable lien cannot exist in contradiction to the statutory requirement that "no such lien shall attach until such time as the proceeds of such recovery are in the possession and control of such claimant." Public Acts 1981, No. 81-386, § 2; see *Columbia Federal Savings Bank* v. *International Site Consultants, Inc.*, 40 Conn. App. 64, 69, 669 A.2d 594, cert. denied, 236 Conn. 910, 671 A.2d 824 (1996) (holding that equitable lien was subject to statutory time limitations provided by General Statutes § 49-92c, with respect to purchaser's liens, and stating that "[c]ommon sense dictates that the legislature intended to subject the common law equitable lien to the statutory lien provisions"); see also 51 Am. Jur. 2d 193, Liens § 65 (1970) ("The method of enforcing a

statutory lien is usually prescribed by the enactment by which it is conferred, and it is generally held that where this is the case, the enforcement of the lien must be proceeded with in accordance with the provision of the statute. . . . Also, where a statute creates a specific lien and creates a specific remedy for its enforcement, a court of equity has no jurisdiction to enforce it, in the absence of some special ground of equitable interposition rendering the remedy available at law unavailable or inadequate.").

The defendant, by disciplining the plaintiff, was attempting, for the benefit of Safeco, USAA, and other insurance companies in a similar position, to wield the grievance process in order to accomplish what could not be accomplished through law or equity. If the defendant was successful in this litigation, then this case would be precedent for the ironic proposition that attorneys would have an ethical duty to enforce a lien that *could not* be judicially enforced pursuant to statute until the proceeds were in the hands of the client. I cannot agree that this is our law.

It is clear from the foregoing that Safeco and USAA had no liens or other legally cognizable interests in the settlement proceeds while they were in the hands of the plaintiff, the attorney for the insureds. Notwithstanding the strong statement of the public policy of the state to the contrary, the defendant is unable to point to any source that would give Safeco and USAA an interest in the settlement proceeds while they were in the plaintiff's hands.

## II

Without some cognizable interest in the settlement proceeds, the defendant is unable to invent an interest in the proceeds that would give rise to a duty on the part of the plaintiff to notify Safeco and USAA that he or his clients were in receipt of the proceeds, absent

agreement by the client. Such a construction would conflict with a lawyer's duty of loyalty to his client. Rule 1.6 (a) of the Rules of Professional Conduct, with respect to confidentiality of information, provides that "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation" and for several specific reasons stated in the rule that are not relevant here.[3] "A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. . . . The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law." Rules of Professional Conduct 1.6, comment, p. 12.1. "The principle of confidentiality binds the lawyer at all times, and generally prevents voluntary disclosures except when made with the consent of the client or in furtherance of the legal representation, in which case client consent may fairly be inferred." 1 G. Hazard & W. Hodes, supra, § 1.6:108, p. 168. In the present case, the plaintiff had a duty to his clients—a duty of confidentiality—and that duty cannot be subverted by claims that had not yet matured into liens.

Accordingly, for the reasons set forth above, I would affirm the judgment of the Appellate Court.

---

[3] "A lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation, *except to the extent that the client's instructions* or special circumstances *limit that authority*." (Emphasis added.) Rules of Professional Conduct 1.6, comment, p. 12.1. Indeed, that exact situation exists in the present case because one of the plaintiff's two clients involved in this matter, Jones, insisted that the plaintiff distribute to him the full amount of the settlement proceeds, even after the plaintiff advised Jones that he had a legal responsibility to reimburse Safeco.